**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ALLSTATE LIFE INSURANCE** § | | **PLAINTIFF** |
| **COMPANY, SUCCESSOR IN INTEREST** § | | |
| **TO GLENBROOK LIFE AND ANNUITY** § | | |
| **COMPANY** § | | |
| § | | |
| **v.** § | **CIVIL ACTION NO. 1:05CV164-LG-JMR** | |
| § | | |
| **THE ESTATE OF CHARLES THOMAS** § | | |
| **REED, ET AL.** § | | **DEFENDANTS** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON ISSUES
TRIED WITHOUT A JURY PURSUANT TO FED. R. CIV. P. 52**

THIS CAUSE came before the Court on November 19, 2007, for trial without a jury. This is a diversity case requiring application of the law of the State of Mississippi. This action began as an interpleader filed by Allstate Life Insurance Company against the individuals claiming to be the beneficiary of an annuity purchased by Charles Thomas Reed. The claimants include Virginia Parnell, individually and as executrix of the Estate of Charles Reed, John Reed, Ralph Marshall and Suzuko Marshall. Parnell also filed a cross-claim against the Marshalls, alleging undue influence in regards to the designation of Suzuko as primary beneficiary of the annuity and their sale of Reed's coin collection. Ralph and Suzuko filed a cross-claim against Parnell, alleging undue influence concerning a change of beneficiary form signed by Reed on the day before his death naming Parnell and John Reed as beneficiaries. All other counterclaims and cross-claims have been dismissed.

After careful consideration of the testimony presented at trial and the exhibits introduced into evidence, the Court finds that the Estate of Charles Thomas Reed is entitled to the proceeds of the annuity purchased by Charles Thomas Reed that are currently held in the Court registry. The Court further finds that the Estate of Charles Thomas Reed is entitled to a judgment against

Ralph and Suzuko Marshall in the amount of $10,866.90, which represents the undisputed value of Reed's coin collection.

## FINDINGS OF FACT

Charles Thomas Reed lived at the Armed Forces Retirement Home in Gulfport, Mississippi, from 1993 until his death. He died on January 28, 2004, at the age of 75. Reed was divorced and had five children, including Virginia Parnell and John Reed. After moving into the Retirement Home, Reed executed a will in which he left all of his property to Virginia.

Ralph Marshall became chief of operations at the Retirement Home in 2001. His wife, Suzuko, volunteered in the Retirement Home's greenhouse. Ralph and Suzuko met Reed at the Retirement Home and became close friends. Reed often visited in the Marshalls' home and spent time working in the greenhouse with Suzuko. During this time Retirement Home employees and their family members were required to comply with express regulations concerning the acceptance of gifts from residents. Specifically, they were prohibited from soliciting or accepting, either directly or indirectly, gifts from the residents.[1] The evidence shows that Ralph signed at least two documents certifying that he had read a copy of the materials concerning the Retirement Home's policy on accepting gifts. (P-33, P-35). As Reed's personal relationship matured with the Marshalls, he became interested in Ralph and Suzuko's Buddhist faith and eventually became a member of Nichiren Daishonin Buddhism, attending regular religious

---

[1]Standards of Ethical Conduct that applied to its employees of the Retirement Home provided: "Except as provided in this subpart, an employee shall not, directly or indirectly, solicit or accept a gift: (1) From a prohibited source; or (2) Given because of the employee's official position." (P-32 at 8). The Retirement Home's Employee Ethics handbook provided in bold print: "It is AFRH-G policy that employees are prohibited from accepting gifts of any value or any amount of money given to them or family members by AFRH-G residents or family members."

gatherings with Ralph and Suzuko.

In the summer of 2003, Reed was diagnosed with lung cancer.[2] The testimony shows that Suzuko and Ralph began accompanying Reed to medical appointments and assisted him in obtaining his prescription medications and running other errands. Reed frequently stayed overnight in Ralph and Suzuko's home. It was during this time that Reed told Ralph and Suzuko that he wanted to give his car, his money, and property to them when he died. Ralph testified that he protested and told Reed he could not accept money from him because he worked at the Retirement Home. Ralph and Suzuko both testified that Reed was stubborn and persistent, and eventually they gave in because they wanted to appease Reed and make him happy. In addition, Ralph testified that he believed that it would not violate the Retirement Home's policies for Reed to give the property to Suzuko.

Ralph and Suzuko suggested that Reed discuss his desire to give them money with a lawyer and gave him their lawyer's name. Suzuko testified that they asked Reed to go with them when they met with their lawyer, but he refused. Nevertheless, Ralph and Suzuko met with the lawyer and discussed Reed's intentions to bequeath the bulk of his property to Suzuko. The lawyer told the Marshalls that Reed should see two doctors to document his competence before changing his will. Ralph and Suzuko conveyed the lawyer's advice to Reed, and according to Suzuko, they tried to help Reed set up appointments with doctors. However, Reed canceled the appointments. In a statement admitted into evidence by the agreement of the parties, Suzuko stated that Reed later told her that he had found a way that he could go to the bank and change his

---

[2]The parties have not produced medical records that provide the date on which Reed was diagnosed with cancer. However, Ralph and Suzuko testified that Reed told them he had cancer around the July 4, 2003, holiday.

will for free.

In July of 2003, Reed told Linda Helwick, an employee of the Hancock Bank branch located at the Retirement Home, that he was concerned about his gold market investments. Helwick suggested that he purchase an annuity. Helwick later learned that Reed had liquidated his gold market investments and deposited the funds in his checking account. Helwick scheduled a July 7, 2003, appointment for Reed with her supervisor, Linda Madden, in order to discuss his options. Madden testified that Reed seemed very much in control of what he wanted to do, but he was still undecided as to the type of investment that he wanted. He told Madden that he would check with other banks regarding the rates and products that were available. On July 15, 2003, Madden, Helwick, and Reed met once again to discuss his interest in the purchase of an annuity.

On July 31, 2003, Reed returned to the bank and informed Helwick that he had decided to purchase the annuity. She scheduled a meeting with him for 12:00 p.m. that day, and they began the application process and paperwork. Reed told Helwick that he wanted to name Suzuko as the beneficiary of the annuity, but he did not know how to spell her name. On August 1, 2003, Reed returned with Suzuko's name written on a sheet of paper, and the purchase of an annuity valued at $240,000.00 was completed. Suzuko was named as the sole beneficiary. Helwick testified that she did not know who Suzuko was. She asked Reed about their relationship, and he told her she was his friend. Reed told Helwick that Suzuko was like family to him and she did everything for him. Helwick testified that she told Reed that $240,000.00 was a lot of money to leave to a friend and that most people leave their money to family members, but despite her comments Reed chose to name Suzuko as beneficiary. On a later visit to the bank, Reed told Helwick that his daughter had visited him. Helwick asked him if he wanted to change the beneficiary on his annuity, and he told her that he did not. Suzuko and Ralph did not attend the meetings with

Helwick and Madden regarding the purchase of the annuity, but Madden testified that Suzuko was waiting outside the bank after the July 15, 2003, meeting, and she spoke with Suzuko for a few moments.

Ralph and Suzuko contend that they did not know that Reed had purchased the annuity or named Suzuko as a beneficiary but concede that he had told them he had put $240,000.00 in an account for Suzuko. Ralph and Suzuko testified that they told Reed that any money he gave them would be donated to charity. They also testified that they did not believe Reed when he told them he was going to leave Suzuko his money.

Prior to his death Reed also owned a valuable coin collection. After Reed was diagnosed with cancer, Ralph testified that he found Reed's coin collection in the trunk of Reed's car. Ralph told Reed that it was not safe to keep the coins in the trunk, but Reed replied that he did not trust the bank and was afraid it had been taking his coins. Ralph assisted Reed in inventorying the collection, and Reed then placed the coins in a safe deposit box under his name and Suzuko's name. Suzuko testified that she accompanied Reed on this trip to the bank. However, Reed again began to mistrust the bank and asked Ralph to keep the coin collection in his garage. Ralph also testified that Reed asked him to sell the coins and give the proceeds from the sale to Suzuko. Ralph testified that he told Reed that Suzuko would donate the money to charity. Ralph sold part of the collection in October of 2003 and the remainder of the collection in early 2004. He was paid a total of $10,866.90 for the coins. All of the checks received from the sale of the coins were made payable to Ralph. Ralph testified that Reed told him to donate some of proceeds to the Gulf Coast Doberman Rescue, Inc., where Ralph had served as a volunteer. The proceeds of the coin sales were deposited in Suzuko's bank account and were later donated in the name of Ralph and Suzuko Marshall to the Doberman Rescue and to a

Buddhist college. Ralph and Suzuko did not report the proceeds of the sale of the coin collection as income but reported a charitable tax deduction as a result of the donations. Ralph admitted that no reference was made to Reed when they made the donations. Ralph testified that their tax refund for that year was also donated to charity, to ensure that he received no benefit from the sale of the coins. Ralph and Suzuko never told anyone, including Reed's family or the Retirement Home, that they had sold the coin collection and donated the proceeds to charity. Ralph testified that he always considered the coins to belong to Reed. He testified: "This was not my money. This was Mr. Reed's money. He said he wanted to give it to Suzuko." As a result, Ralph testified that he did not request an ethics opinion concerning the alleged gift of the coins to Suzuko.

During their association Reed also gave jewelry to Suzuko, and at her request, he wrote a note stating, "To who [sic] it may concern, I[,] C.T. Reed freely give to Suzuko 1 gold pendents [sic] & pair of ear ring [sic] & rings." (Ex. P-24). The Estate of Charles Reed has not demanded the return of the jewelry in this lawsuit. There was no documentation of the coin collection transfer.

Reed's condition began to deteriorate. When nurses noticed that Reed was having difficulty remembering appointments, Dr. John Sladky, a neurologist, was asked to evaluate Reed in order to determine whether he suffered from dementia and the severity of any dementia so that it could be determined whether Reed was competent to undergo chemotherapy. Dr. Sladky's evaluation was performed on September 16, 2003. Reed answered questions appropriately but had short-term memory problems and mild speech problems. Dr. Sladky diagnosed Reed with mild to moderate dementia of the Alzheimer's type but determined that Reed was capable of proceeding with chemotherapy.

In December of 2003, Reed was admitted to Biloxi Specialty Hospital. Reed's medical records reveal that he pulled off his tracheotomy collar and threw it on the floor on December 16, 2003. (P-10). He also pulled off other medical devices on that date. (P-10). Additional notes in his medical records reveal that this behavior continued at least through December 22, 2003. (P-10). As a result, Reed was placed in restraints. On January 8, 2004, Reed was evaluated by Dr. Simone J. Simone, a clinical psychologist. At trial, Dr. Simone testified that Reed suffered from dementia and he was not able to make informed decisions. She testified that he was placed in restraints because he could not understand that he should not pull out his IVs. He was not capable of learning that this behavior was harmful to his health. He also was not oriented to person, place, and time, and he could not follow a three-step command. As a result, she opined that he was not competent and it is unlikely that his condition would have changed prior to his death. However, Dr. Sladky, the neurologist who evaluated Reed in September of 2003, reviewed Dr. Simone's report and disagreed with her opinion. He testified that Reed could have regained his faculties after Dr. Simone's evaluation. He explained that dementia can be temporarily worsened by episodes of delirium caused by infection or medication.

In late January of 2004, Parnell and her husband traveled from their home in Florida to visit Reed in the hospital. During this visit, they stayed with Ralph and Suzuko.[3] Hospital employees told Parnell that Reed needed to be moved to another care facility, but there was concern that he would not be able to return to the Retirement Home because he now had a tracheotomy. She also could not move him to another facility because she did not have a power of attorney. However, Lon Reed, a social worker at the Retirement Home, told her that a local

---

[3] Parnell and her husband had met and spent time with Suzuko and Ralph during prior visits to the Retirement Home.

attorney, Timothy Murr, had been asked to prepare a power of attorney. She was instructed to pick up the power of attorney from Murr's office. The form granted both Parnell and her brother, John Reed, power of attorney. It was signed by Reed in the presence of Murr on January 20, 2004. Murr testified that he spoke with Reed for about forty-five minutes during that visit. Reed told Murr that he wanted to grant his son and daughter power of attorney. Murr believed that Reed was competent to execute the document. No family members were present when the document was signed, and no family members were involved in the preparation of the power of attorney. Murr testified that he prepared the power of attorney at the request of Lon Reed, the social worker at the Retirement Home. However, the document contained a spelling error, and therefore, Parnell told her father that the original document contained a mistake and asked him if he wanted to sign the document again. Parnell testified that her husband, her brother, and her sister-in-law were present when the power of attorney was signed the second time by Reed.

On or about January 26, 2004, Parnell found the annuity application in Reed's room. She also found a separate sheet of paper that contained Suzuko's name and social security number in Reed's handwriting. The circumstances under which Reed obtained Suzuko's social security number from either Ralph or Suzuko are unclear. Parnell later met with Helwick at Hancock Bank and showed her the Power of Attorney. She also requested a change of beneficiary form for the annuity. Helwick would not provide Parnell with a form, but Parnell obtained one from another Allstate agent.

Reed's condition continued to worsen. On January 27, 2004, Parnell assisted Reed in signing a change of beneficiary form that designated John Reed and Parnell as equal beneficiaries of the proceeds of the annuity. Parnell testified that she asked Reed if he wanted to change the beneficiary of his annuity and give it to his family, and he replied that he had been thinking about

it and wanted his family to have it.  Parnell stated that Reed was in restraints in his hospital bed, so she held a book under the form so that her father could sign it.  The change of beneficiary form was faxed from a hotel to Allstate after 11:00 p.m. on January 27, 2004.  Reed died on January 28, 2004.  Ralph and Suzuko testified that they first learned that Suzuko had been named sole beneficiary of Reed's annuity in April of 2004.

<u>**CONCLUSIONS OF LAW:**</u>

<u>**THE DESIGNATION OF SUZUKO MARSHALL AS BENEFICIARY OF THE ANNUITY**</u>

The parties concede that Reed was competent when he purchased the annuity.  However, the Estate alleges that Reed was subjected to undue influence when he designated Suzuko as the beneficiary of the annuity.  The parties also concede that the relationship between Reed, Ralph and Suzuko amounted to a "confidential relationship."

The parties apparently concede that the designation of Suzuko as beneficiary of the annuity constituted an *inter vivos* transaction.  Nevertheless, the purchase of an annuity is arguably testamentary in nature because the beneficiary's right to the funds only arises upon the owner's death.  *See Madden v. Rhodes*, 626 So. 2d 608, 618-19 (Miss. 1993) (holding that a series of transactions were *inter vivos* in nature because the grantee could have taken possession of the assets at issue prior to the grantor's death).  None of the parties asserts that the purchase of the annuity constituted a testamentary gift.  However, regardless of whether the annuity here is considered a testamentary gift or an *inter vivos* gift, because Suzuko enjoyed a confidential relationship with Reed, a rebuttable presumption of undue influence exists.  *See Lancaster v. Boyd*, 927 So. 2d 756, 759 (Miss. Ct. App. 2005) (explaining that if a confidential relationship exists among the parties to an *inter vivos* gift, a rebuttable presumption of undue influence arises automatically); *Madden*, 626 So. 2d at 618 (noting that abuse of the confidential relationship by a

beneficiary to a testamentary gift creates a rebuttable presumption of undue influence).

Suzuko can rebut the presumption of undue influence by establishing the following elements by clear and convincing evidence: (1) that she acted in good faith; (2) that Reed had full knowledge and deliberation of his actions and the consequences of those actions; **and** (3) that Reed exhibited independent consent and action.  *See Lancaster*, 927 So. 2d at 759.  The failure to rebut any of these elements by clear and convincing evidence is fatal.

Under Mississippi law, the Court must consider the following factors in determining whether Suzuko acted in good faith: (1) determination of the identity of the initiating party in seeking preparation of the instrument; (2) the place of the execution of the instrument and in whose presence; (3) the consideration and fees paid, if any; (4) by whom paid; and (5) the secrecy and openness of the execution of the instrument.  *Id.*

By virtue of their positions at the Retirement Home, Ralph and Suzuko were expressly prohibited from soliciting or accepting gifts from Reed.  As explained during the testimony, the Retirement Home recognizes that its employees and their families must avoid even the perception of undue influence over the affairs of the residents.  Brock Fowler, who was responsible for employee conduct and disciplinary matters at the Retirement Home, testified that Residents of the Retirement Home were "prohibited sources."  One exception to this prohibition applied to gifts motivated by personal relationships, such as a family relationship or personal friendship, rather than the position of the employee.  (P-32 at 13).  However, the exception stated that the history of the relationship must be considered when determining whether a gift qualified under the exception.  (P-32 at 13).  Fowler testified that a friendship formed between a resident and an employee at the Retirement Home did not qualify as a "personal relationship" under this exception because the friendship arose out of the employee's position at the Retirement Home.

According to Fowler, the exception only applied to friendships that existed prior to employment at the Retirement Home. The Standards also provided that a gift that was accepted "indirectly" included a gift given with the employee's knowledge and acquiescence to his spouse as well as a gift given to a charitable organization on the basis of designation, recommendation, or other specification by the employee. (P-32 at 12). Thus, a gift to an employee's spouse or to a charity chosen by the employee constitutes an indirect gift under the plain language of the Retirement Home standards policies. Even in the absence of standards and guidelines prohibiting such gifts, the courts have held that it is unethical for volunteers and employees of retirement homes, nursing homes, and other assisted living facilities to accept gifts of substantial value from residents, who are vulnerable and separated from their families and who rely on those employees and volunteers for assistance with their basic needs. For example, in *Madden*, the Mississippi Supreme Court held that a hospice volunteer's unethical behavior in accepting funds from a patient was indicative of bad faith. *Madden*, 626 So. 2d at 621. Moreover, the evidence shows that Ralph and Suzuko tried to persuade Reed to see a lawyer concerning his desire to leave them his money. They attempted to persuade him to see doctors to establish his competency to make the gift. They admit that Reed told them he had put $240,000.00 in an account for Suzuko but failed to report this information to the Retirement Home or Reed's family prior to Reed's death, despite repeated opportunities to do so. Their failure to notify family members prior to Reed's death prevented an inquiry as to Reed's true wishes or whether his plans for the distribution of the estate were the product of improper or undue influence. The trial evidence does not establish by clear and convincing evidence that the Marshalls acted in good faith.

  The Court further finds that Suzuko has not demonstrated that Reed exerted full knowledge and deliberation as to the consequences of his actions by clear and convincing

evidence. The following factors should be considered when determining this element:

> (a) the grantor's awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, © whether non-relative beneficiaries would be excluded or included, and (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.

*Wright v. Roberts*, 797 So. 2d 992, 1001 (¶31) (Miss. 2001). Ralph and Suzuko have presented testimony from Helwick and Madden that Reed met with the bank employees on four occasions concerning his interest in an annuity. However, neither Helwick or Madden testified that Reed ever requested assistance in changing his will. He only expressed concern over his investments in the gold market. In the last two meetings, he told Helwick he wanted Suzuko to be the primary beneficiary of the annuity he had purchased. Helwick advised Reed that most people name family members as beneficiaries, but there is no evidence that Reed understood the effect of the annuity on his will, particularly since Helwick and Madden were unaware of the terms of his will and therefore could not explain this to Reed. There is no evidence that Reed had an awareness of his total assets and their general value, although he was considered an intelligent investor by Helwick and Madden. Therefore, Suzuko has not demonstrated that Reed exerted full knowledge and deliberation as to the consequences of his actions by clear and convincing evidence.

Finally, Suzuko has not demonstrated that Reed exhibited independent consent and action by clear and convincing evidence. Once again, Suzuko relies on the testimony of Helwick and Madden concerning this element. The best manner of demonstrating this element is to show that Reed received the advice of a competent person, disconnected from Suzuko, and wholly devoted

to Reed's interests. *See Dean v. Kavanaugh*, 920 So. 2d 528, 537 (¶46) (Miss. Ct. App. 2006). Although Helwick's testimony that she advised Reed that $240,000.00 is a lot of money to give to a friend and that most people name family members as beneficiaries is persuasive, the testimony of Madden and Helwick at trial demonstrates that they were primarily concerned with advice concerning the product purchased by Reed, and the choice of beneficiary was not a matter that concerned the bank. This can hardly be characterized as meaningful advice wholly devoted to Reed's estate planning interests. Additionally, Ralph and Suzuko's admitted participation in attempting to change Reed's will arouses suspicion that negates any finding of independent action by Reed. *See Dean*, 920 So. 2d at 537 (¶46). Therefore, Suzuko has not demonstrated that Reed exerted independent consent and action.

The Court acknowledges that Ralph and Suzuko provided comfort, companionship, and care to Reed during a difficult period in his life. However, the Court cannot ignore the fact that the Marshalls' relationship with Reed arose by virtue of their positions with the Retirement Home. In the opinion of the Court, the Marshalls' evidence falls far short of the clear and convincing standard necessary to rebut the presumption of undue influence. As the Mississippi Supreme Court has noted, the requirement of demonstrating the absence of undue influence by clear and convincing evidence may be a harsh rule, but "the law must protect those who cannot protect themselves." *Madden*, 626 So. 2d at 619. The presumption of undue influence is intended to alleviate the problems and uncertainty that arise when a gift is disputed after the grantor's death and only those who stand to benefit from the gift are left to tell the Court what happened. *Id.* Thus, the Court finds that the designation of Suzuko as beneficiary of the annuity was the product of undue influence.

**THE CHANGE OF BENEFICIARY**

In the opinion of the Court, the validity of the change of beneficiary form is relevant in that such a finding is necessary to the determination of whether Parnell or the Estate of Reed are entitled to the funds that are currently held in the Court's registry.  If the change of beneficiary is valid, Parnell, in her individual capacity, is entitled to the funds, and it is not necessary for the funds to first pass through Reed's estate.  If, on the other hand, the change of beneficiary is not valid, the Estate of Reed is entitled to the funds.

The Marshalls contend that Reed was not competent to sign the change of beneficiary form on the day before his death.  The party seeking to set aside a donation must demonstrate that the grantor lacked mental capacity at the time of execution by clear and convincing evidence.  *In re Conservatorship of Cook*, 937 So. 2d 467, 470 (Miss. Ct. App. 2006).  The relevant inquiry is "whether the grantor understands and appreciates the nature of his act, the natural objects or persons of his bounty and their relation to him, and is capable of determining how he desires to devise and bequeath his property."  *Whitworth v. Kines*, 604 So. 2d 225, 228 (Miss. 1992).

In support of their claim that Reed lacked the mental capacity to sign the change of beneficiary form on the day before his death, Ralph and Suzuko rely on the testimony of Dr. Simone Simone, who evaluated Reed over two weeks prior to his death.  Dr. Simone testified that the fact that Reed was in restraints at the time when he signed the change of beneficiary form indicates that he could not understand that it was harmful to his health to pull out IVs and other medical devices.  Dr. Simone also testified that Reed was not competent when she evaluated him on January 8, 2004.  However, Timothy Murr, an attorney, met with Reed on January 20, 2004, and determined that he was competent to sign a power of attorney.  In view of the conflicting evidence concerning Reed's competency in the month prior to his death and the lack of evidence

concerning Reed's competency in the last few days of his life, the Court cannot conclude, under the clear and convincing standard, that Reed did not have the mental capacity to sign the change of beneficiary form.

However, even if Reed had the mental capacity to sign the change of beneficiary form, the Marshalls contend that Parnell exerted undue influence over her father. Parnell does not concede that she enjoyed a confidential relationship with her father at the time he executed the change of beneficiary form. The contestant has the burden of proving the existence of a confidential relationship. *Estate of Sandlin v. Sandlin*, 790 So. 2d 850, 853 (¶7) (Miss. Ct. App. 2001). The following seven factors are used in order to determine whether a confidential relationship exists:

> (1) whether one person has to be taken care of by others;
> (2) whether one person maintains a close relationship with another;
> (3) whether one person is provided transportation and has their medical care provided for by another;
> (4) whether one person maintains joint accounts with another;
> (5) whether one is physically or mentally weak;
> (6) whether one is of advanced age or poor health;
> (7) whether there exists a power of attorney between the one and another.

*Sandlin*, 790 So. 2d at 853 (¶7). It is undisputed that Reed was hospitalized and completely dependent upon others on the day he signed the change of beneficiary form. Additionally, Parnell testified at trial that she and her father had a close relationship, despite the distance that separated them in the last years of his life. Reed was of advanced age and was physically weak. He suffered from dementia, was in restraints, and was dying of lung cancer. Parnell testified that she was listed on Reed's checking account, and she had a Power of Attorney. Therefore, based upon the evidence, the Court finds that a confidential relationship existed between Reed and Parnell.

Once again, it is not necessary for the Court to determine whether the annuity constituted an *inter vivos* gift or was testamentary in nature because a presumption of undue influence exists under either standard due to Parnell's undisputed involvement in asking her father to sign the form. *See Madden*, 626 So. 2d at 618. As explained previously, Parnell can rebut the presumption of undue influence by demonstrating the following by clear and convincing evidence: (1) that she acted in good faith; (2) that Reed had full knowledge and deliberation of his actions and the consequences of those actions; **and** (3) that Reed exhibited independent consent and action. *See Lancaster*, 927 So. 2d at 759. The factors relevant to the determination concerning these elements are discussed *supra*. Parnell initiated the signing of the change of beneficiary form and did so privately, with no witnesses present. Once again, Reed was in restraints and was extremely ill when he signed this form. He died within hours of executing the change of beneficiary. Therefore, she cannot demonstrate good faith by clear and convincing evidence. Additionally, Parnell cannot demonstrate that Reed exercised independent consent and action because of her participation in obtaining the form and asking her father to sign the form. *See Dean*, 920 So. 2d at 537 (¶46). Finally, Parnell cannot demonstrate full knowledge and deliberation on the part of Reed, since there is no evidence regarding whether he had any awareness of his total assets, any understanding of who controlled his finances while he was in the hospital, or any understanding of the effect that the change of beneficiary form would have. Therefore, the Court finds that the change of beneficiary form was the product of undue influence. Since there is no valid beneficiary to the annuity, the Court finds that the Estate of Charles Thomas Reed is entitled to the annuity funds that are held in the court registry.

**THE COIN COLLECTION**

"A party attempting to prove that an *inter vivos* gift was made must show the following by clear and convincing evidence: (1) that the donor was competent to make a gift; (2) that the donation was a voluntary act and the donor had donative intent; (3) that the gift must be [sic] complete and not conditional; (4) that delivery was made; and (5) that the gift was irrevocable." *In re Estate of Ladner*, 909 So. 2d 1051, 1054 (¶9) (Miss. 2004). Ralph and Suzuko have not demonstrated that the coins were a gift, because they have not demonstrated that Reed had donative intent by clear and convincing evidence. Specifically, Ralph testified that he always viewed the coins as belonging to Reed, even while he sold them and donated them to charities in the name of Ralph and Suzuko Marshall.

Furthermore, as noted, Ralph and Suzuko were in a confidential relationship with Reed at the time of the *inter vivos* transfer of the coins. Thus, there is a presumption of undue influence. Ralph and Suzuko have not rebutted this presumption by clear and convincing evidence. First, Ralph and Suzuko cannot demonstrate good faith as to their possession and disposition of the coins due to their positions at the Retirement Home and their secrecy. Additionally, there is no evidence that Reed exhibited independent consent and action. In particular, he did not receive advice from a competent person disconnected from Ralph and Suzuko who was devoted wholly to Reed's interests. Finally, there is no evidence that Reed had full knowledge and deliberation of his actions and the consequences of those actions.

In the opinion of the Court, the transfer of the coin collection to the Marshalls was a product of undue influence, which has not been rebutted by the exacting "clear and convincing" standard. Therefore, the Estate of Reed is entitled to the proceeds of Reed's coin collection, which was sold by Ralph and was donated to charity by Ralph and Suzuko.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Estate of Charles Thomas Reed is entitled to the proceeds of the annuity that are currently held in the Court registry.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Estate of Charles Thomas Reed is entitled to a judgment in the amount of $10,866.90, which represents the undisputed value of Reed's coin collection, against Ralph and Suzuko Marshall.

**SO ORDERED AND ADJUDGED** this the 28th day of December, 2007.


s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE